## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL T., | ) | |
| | ) | |
| Plaintiff, | ) | No.  20 C 6960 |
| | ) | |
| v. | ) | Judge Jorge L. Alonso |
| | ) | |
| KILOLO KIJAKAZI, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Cheryl T.,[1] seeks judicial review of the defendant Commissioner of Social Security's[2] denial of her application for Disability Insurance Benefits, *see* 42 U.S.C. § 423. For the reasons set forth below, the Court reverses defendant's decision and remands this case to the Social Security Administration for further proceedings.

### <u>Background</u>

On April 25, 2018, plaintiff filed an application for Social Security Disability Insurance Benefits ("DIB"), alleging disability beginning March 30, 2018. Her application was denied on September 7, 2018, and reconsideration was denied on December 11, 2018. Plaintiff obtained a hearing before an administrative law judge ("ALJ") on January 21, 2020.

---

[1] Pursuant to this district's Internal Operating Procedure 22, the Court refers to plaintiff by her first name and the first initial of her last name.

[2] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been automatically substituted as defendant in this matter.

At the hearing, plaintiff stated through counsel that she suffers from numerous health issues, including chemotherapy-induced neuropathy following treatment for breast cancer, arthritis, carpal tunnel syndrome, a herniated disk in her back, and obesity. (Certified Copy of Administrative Record ("AR") at 15, ECF No. 14.) In her testimony, plaintiff stated that she had worked for a life insurance company for twenty-nine years, performing administrative, clerical, and customer service duties. In approximately the spring of 2017, her job performance began to suffer because she was having trouble typing due to the chemotherapy-induced neuropathy in her hands. She could not feel the keyboard, and often her hands felt so cold that she needed to wear gloves. Additionally, a drug she was taking to alleviate the neuropathy—Gabapentin, a nerve pain medication—made her so drowsy that she sometimes needed naps during the day. (AR 19-20, 25-26, 28-30.) Because of the typing issue, there were frequent errors in the figures plaintiff would input into her reports, and, because of her drowsiness, she often failed to catch the errors before she submitted her reports. (AR 28-29.) Plaintiff's employer scaled back her duties due to these job performance issues. About a year later, in March 2018, the employer decided that it could not keep plaintiff on at her reduced capacity, and her employment was terminated.

Plaintiff explained that she feels a constant "buzz" in her hands, which becomes painful without the Gabapentin, and only tolerable with it. Even with the Gabapentin, she has trouble holding a pencil and writing because her hands lock up or cramp, and, due to the loss of sensation in her fingertips, she cannot tell when she is depressing a key while typing. (AR 25-26.) She has trouble separating pages of a book or pieces of paper from one another, as one might have to do when opening mail. (AR 25.) She sometimes goes to pick up an item but, unsure whether she has

actually grasped the object, ends up dropping it, occasionally breaking it. (AR 26.) The neuropathy problem in her fingers has gotten progressively worse over time. (*Id.*)

Plaintiff has had total replacements of both knees, and she has generally used a cane or rolling walker since the beginning of her knee issues. (AR 21-23.) She used to regularly cook full meals for her family (she lives with her son, daughter-in-law, and grandchildren), but now she cannot stand up long enough to do so. She reported having trouble going up and down stairs, in part because she could not feel her feet touching the steps. (AR 24.) She stated that she cannot carry heavy objects such as a basket of laundry. Indeed, she testified that, even when her grandchildren bring a load of laundry to her, she cannot fold an entire load without needing to stop and lie down. (AR 27-28.)

The administrative law judge, having heard plaintiff's testimony, proceeded to review her medical records and determine whether she was disabled. To determine whether a claimant is disabled, the Social Security Administration ("SSA") follows a five-step review process, sequentially assessing "(1) the claimant's current work activity; (2) [if none,] the medical severity and duration of the claimant's impairments; (3) whether the claimant's impairments meet or medically equal the requirements of an impairment listed in the regulations; (4) [if not,] whether the claimant has the residual functional capacity to return to past relevant work; and (5) if the claimant cannot return to past relevant work, whether he or she can 'make an adjustment to other work' in the national economy." *Varga v. Colvin*, 794 F.3d 809, 812 n. 2 (7th Cir. 2015) (citing 20 C.F.R. § 404.1520(a)(4)(i)-(v)). The ALJ followed this five-step process and, on February 27, 2020, in a written decision, he ruled that plaintiff was not disabled.

The ALJ explained that plaintiff had certain severe impairments, which he described as "osteoarthritis of bilateral knees status-post total knee arthroplasties, degenerative disc disease of lumbar spine with radiculopathy, morbid obesity, breast cancer status-post lumpectomy and dissection, radiation and chemotherapy, small fiber neuropathy in fingers and toes, bilateral carpal tunnel syndrome, and chronic kidney disease." (AR 64.) The ALJ found that none of these impairments rose to a level of severity to match the impairments listed in the regulations. (AR 64-66.) After reviewing the evidence, he concluded that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (AR 67.) Those statements about "intensity, persistence and limiting effects" of the symptoms, the ALJ found, were "inconsistent because the severity of her impairments [was] not evidenced in the record as a whole" and "the record fails to establish her inability to perform all work functions." (*Id.*)

The ALJ went on to review in some detail the evidence concerning plaintiff's various impairments, including her musculoskeletal impairments (namely, her back and knee issues), as well as her treatment for metastatic breast cancer—which was in remission—and kidney disease—which was stable and did not require dialysis. As for her "carpal tunnel in both hands," he cited evidence that plaintiff had no difficulty with "fine and gross manipulation in her bilateral hands and fingers" during a consultative evaluation, and "nerve studies conducted at NorthShore University Healthcare System in 2017 noted that there was no evidence of 'large fiber neuropathy involving right upper or lower extremity' and [only] 'mild' neuropathy in the right" upper extremity. (AR 68 (quoting AR 584-85).) Further, records showed that both the consultative

4

examiner and plaintiff's treating physician, Dr. Angelo Babbo, had remarked that her "sensation" was "intact." (AR 68 (citing AR 472, 628-633, 849).) The consultative examiner also remarked that plaintiff had "no limitation in house chores." (AR 68 (citing AR 469).) Plaintiff had told a treating medical provider that she was "staying active."[3] (AR 372.) Again citing the "nerve stud[y] conducted at NorthShore" in 2017, the ALJ recognized that an EMG (*i.e.*, electromyogram) found that plaintiff had reduced strength in her upper extremities and confirmed her bilateral carpal tunnel syndrome. But, according to the ALJ, these impairments warranted only modest limitations of "no more than frequent fingering and lifting no more than 20 pounds occasionally and 10 pounds frequently." (AR 68.)

The ALJ recognized that Dr. Babbo evaluated plaintiff's impairments in September 2018, filling out a "Peripheral Neuropathy Residual Functional Capacity Questionnaire," in which he opined that plaintiff suffered from numerous limitations in strength and mobility due to her various ailments, including her knee and back problems, and she "exhibited reaching and fingering bilaterally limitations, and would be unable to use a keyboard." (AR 69 (citing AR 476-78).) The ALJ also acknowledged that Dr. Babbo evaluated plaintiff again in December 2019, filling out another "Peripheral Neuropathy Residual Functional Capacity Questionnaire," in which he assessed some of the same impairments and opined, among other things, that (a) plaintiff had "pain/paresthesia" in her hands and feet that was "severe," (b) her use of Gabapentin made her drowsy, (c) she could sit, stand, or walk for less than two hours per workday, (d) she would need

---

[3] The Court notes that this remark may leave out important context. The same medical record reveals that plaintiff also stated that she couldn't "feel anything under [her] feet" due to her neuropathy, so she could not drive a car, but she was "trying to get out on a regular basis" nevertheless. (AR 372.)

to take hourly breaks of five to ten minutes to deal with aches, fatigue, and cramping, (e) she would need to elevate her legs to 90 degrees for 95% of the workday, (f) she could only use her hands for "grasping, turning, twisting objects" for about 10% of the workday, and (g) she could only use her fingers for "fine manipulations" for 5% of the workday. (AR 587-89.) According to the ALJ, although Dr. Babbo had treated plaintiff since 2017 and was familiar with her impairments, his 2018 opinion was "only somewhat persuasive" because it was not "wholly consistent with or supported by the objective medical evidence." (AR 69.) Similarly, the ALJ concluded that Dr. Babbo's 2019 opinion was "unpersuasive" because it was "not fully consistent with the objective medical evidence and . . . completely inconsistent with the benign results of his examination on the same date that he rendered his opinion," which contained "no evidence to substantiate the constant elevation of the legs while seated." (*Id.*)

At the hearing, the ALJ asked a vocational expert ("VE") about whether a hypothetical worker with certain restrictions could perform plaintiff's past relevant work as a customer service clerk or administrative clerk. The VE answered that, hypothetically, someone with plaintiff's limitations who could perform "frequent fingering bilaterally" could perform plaintiff's past relevant work, but not if she was only "able to finger *occasionally* bilaterally," and not if she was off task more than 10% of the workday. (AR 33 (emphasis added).)

Based on this evidence, the ALJ concluded that plaintiff had not met her burden of demonstrating that she experienced "persistent issues related to her physical impairments, which severely affect her capacity to perform all forms of work duties." (AR 68.) Instead, plaintiff had the "residual functional capacity" ("RFC")—a term referring to the "most [she] can still do despite [her] limitations," 20 C.F.R. § 404.1545—to perform sedentary work, including her past relevant

work, because, among other findings, she can "frequently finger bilaterally." (AR 66-67, 70-71.) Thus, the ALJ decided that plaintiff was not disabled. (AR 71.)

Plaintiff sought review of the decision by the SSA's Appeals Council, but on September 22, 2020, the Appeals Council denied the request for review, finding no legal error, abuse of discretion, or other defect in the ALJ's decision. (AR 1-3.) Plaintiff now seeks review in this Court.

### Discussion

When the Social Security Appeals Council denies an unsuccessful DIB applicant's request for review, "the ALJ's decision becomes the final decision of the [Commissioner]." *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009). The claimant may seek review of a final decision in a federal district court, which may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The reviewing court's role is "extremely limited." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009). The Court "may reverse the Commissioner's final decision only if it is not supported by substantial evidence or is based on a legal error." *Hopgood v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003) (noting that "[t]his is a deferential but not entirely uncritical standard, for the Commissioner's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues" (internal citations omitted)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal quotation marks omitted). Reviewing courts must not reweigh the evidence or substitute their judgment for the ALJ's; they are limited to "review[ing] the ALJ's decision to determine whether it reflects an adequate logical bridge from the evidence to the conclusions." *Gedatus v.*

7

*Saul*, 994 F.3d 893, 900 (7th Cir. 2021). "A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010).

Plaintiff argues that the ALJ's decision is constitutionally flawed because the Commissioner of Social Security at the time, from whom the ALJ derived his authority, was removable only for cause, which violates the separation of powers. Additionally, plaintiff contends that the ALJ erred by improperly evaluating plaintiff's statements about her symptoms and the medical opinions of her treating physician, Dr. Babbo. Finally, she argues that the ALJ's RFC assessment was not supported by substantial evidence.

## I.    Separation of Powers and Removal of Commissioner Only For Cause

Plaintiff argues that the ALJ's decision must be reversed and remanded, irrespective of its merits or lack thereof, because the structure of the Social Security Administration violates the separation of powers under *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020). In *Seila Law*, the Supreme Court held that it is unconstitutional for a federal administrative agency to be led by a single official who can be removed by the President only for cause, explaining that the authority of "individual executive officials" must "remain[] subject to the ongoing supervision and control of the elected President" because "Article II [of the United States Constitution] makes a single President responsible for the actions of the Executive Branch."   140 S. Ct. at 2203 (internal quotation marks omitted). At the time of the decision to deny her application for DIB, the Social Security Administration was led by a single commissioner, Andrew Saul, who could be removed by the President only for cause. *See* 42 U.S.C. § 902(a)(3). Because the administrative law judges who denied plaintiff's application and affirmed its denial for the Appeals Council derived their

authority from Commissioner Saul, who served in a constitutionally defective position, plaintiff argues, the Court must reverse and remand this case to the Social Security Administration.

Plaintiff may be correct that the statutory prohibition on removing the Commissioner of Social Security except for cause is unconstitutional, but whether the unconstitutional removal provision entitles her to relief from the ALJ's decision is a different question. In *Collins v. Yellen*, 141 S. Ct. 1761, 1787-88 (2021), the Supreme Court made it clear that, whatever constitutional defect there may be in any statutory limitation of the President's authority to *remove* the head of an administrative agency, it does not follow that there is any defect in his *appointment* that might jeopardize the legitimacy of any actions he—or any others operating under his direction—might take to carry out their job functions. Thus, "there is no reason to regard any of the actions taken by [an agency] as void" because of the mere existence of an unconstitutional removal provision such as the one in 42 U.S.C. § 902(a)(3). *See id.* at 1787. Instead, to challenge an administrative "agency's past actions" based on some such provision, a party must "show how the unconstitutional removal provision *actually harmed* the party—for example, if the President would have removed the agency's head but for the provision or, alternatively, if the agency's head 'might have altered his behavior in a way that would have benefited' the party." *Kaufmann v. Kijakazi*, 32 F.4th 843, 849 (9th Cir. 2022) (quoting *Collins*, 141 S. Ct. at 1789).

In light of *Collins*, numerous courts have ruled that a frustrated Social Security applicant mounting a constitutional challenge based on *Seila Law* must show that the unconstitutional removal provision actually caused her harm in some direct and identifiable way. That is, she must show a "nexus between the removal restriction and the harm suffered," and the mere fact of a disappointing "outcome" on her application for Social Security benefits will not suffice. *See*

9

*Linnear v. Kijakazi*, No. CV 121-098, 2022 WL 1493563, at *8-10 (S.D. Ga. May 11, 2022) (citing cases). For example, an applicant could establish the requisite nexus by showing that "1) the commissioner played a role in the agency action and 2) the president would have removed the commissioner to prevent the action but-for the removal provision." *Roth v. Kijakazi*, No. 20-CV-1077-JDP, 2021 WL 6062062, at *5 (W.D. Wis. Dec. 22, 2021); *see Kreibich v. Kijakazi*, No. 20-CV-1045-BBC, 2022 WL 538261, at *6 (W.D. Wis. Feb. 23, 2022) (citing *Roth*). But the mere denial of an application for benefits, without more, does not suffice because the Commissioner might have denied the application in any case. A claim based on that theory would rest "solely on speculation that the Commissioner theoretically might have acted differently," and the applicant "cannot meet her burden of showing actual harm with speculation alone." *Kaufman*, 32 F.4th at 850; *see Jason M. v. Kijakazi*, No. 1:20-CV-03121-MG-SEB, 2022 WL 2071096, at *12 (S.D. Ind. June 9, 2022) (relying on *Kaufman*); *Green v. Kijakazi*, No. 21-C-678, 2022 WL 1644936, at *25 (E.D. Wis. May 23, 2022) (same); *see also Darlene M. F. v. Kijakazi*, No. 1:21-CV-053, 2022 WL 1153506, at *3-4 (N.D. Ind. Apr. 19, 2022) (same result prior to *Kaufman*).

These decisions are persuasive, and the Court agrees that the actions of an ALJ reviewing a DIB application are not void merely because the statute making the Commissioner of Social Security removable only for cause is unconstitutional. There is no basis for "unwind[ing]" an ALJ's decision under such circumstances unless the identity of the Commissioner might have had an effect on the decision-making. *Kaufman*, 32 F.4th at 849 (internal quotation marks omitted). Plaintiff makes no showing that the identity of the Commissioner affected the ALJ's decision here. The closest she comes is to point to some statements made by President Biden or his staff suggesting that the President would have removed Commissioner Saul from office prior to *Collins*

if he had known that the statute ostensibly prohibiting him from doing it was unconstitutional. But this does not show that the outcome of her application would have been any different, and in any case, all the relevant decisions on plaintiff's application were made before President Biden assumed office. The unconstitutional removal provision in 42 U.S.C. § 902(a)(3) provides no basis for remand in this case. Therefore, the Court proceeds to the merits.

## II.     Symptom Evaluation

Under its own rules and regulations, the SSA evaluates a claimant's symptoms in what is essentially a two-step process. First, the SSA determines whether there is "objective medical evidence from an acceptable medical source" showing that the applicant has a "medical impairment(s) which could reasonably be expected to produce the pain or other symptoms." 20 C.F.R. § 404.1529(a). The SSA defines objective medical evidence as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2). If there is such evidence, then the SSA proceeds to the second step, in which it "evaluate[s] the intensity and persistence" of the applicant's symptoms in order to "determine how [they] limit [the applicant's] capacity for work." 20 C.F.R. § 404.1529(c)(1); *see* SSR 16-3p, 2016 WL 1119029, at *4-5 (SSA Mar. 16, 2016).

At this second step, the SSA begins with the objective medical evidence, but it does not rely on it exclusively, as "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." SSR 16-3p, 2016 WL 1119029, at *5. The agency must "carefully consider" all record evidence from "medical sources or nonmedical sources," 20 C.F.R. § 404.1529(c)(3), and it "evaluate[s] [the applicant's] statements," including "statements about the

11

intensity, persistence, and limiting effects" of her symptoms, "in relation to the objective medical evidence and other evidence" to determine whether she is disabled. 20 C.F.R. § 404.1529(c)(4). In doing so, the ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the applicant's] statements and the rest of the evidence, including [the applicant's] history, the signs and laboratory findings, and statements by . . . medical sources or other persons about how [the applicant's] symptoms affect [her]." *Id.* "If an individual's statements about the intensity, persistence, and limiting effects of symptoms are consistent with the objective medical evidence and the other evidence of record, [the SSA] will determine that the individual's symptoms are more likely to reduce his or her capacities to perform work-related activities." SSR 16-3p, 2016 WL 1119029, at *7.

What the SSA may not do is "reject [the applicant's] statements about the intensity and persistence of [her] pain and other symptoms or about the effect [her] symptoms have on [her] ability to work solely because the available objective medical evidence does not substantiate [her] statements." 20 C.F.R. § 404.1529(c)(2); *see* SSR 16-3p, 2016 WL 1119029, at *5 ("[W]e will not disregard an individual's statements about the intensity, persistence and limiting effects of symptoms solely because the objective medical evidence does not substantiate the degree of impairment-related symptoms alleged by the individual.") Further, if the SSA rejects the applicant's statements about her own symptoms, its decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029, at *9. SSA adjudicators may not "make a single, conclusory statement that 'the individual's statements about

12

his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.'" *Id.*

Case law echoes these requirements. "Principles of administrative law require [an] ALJ to rationally articulate the grounds for her decision" in order to permit judicial review, which is "confine[d] to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93-95 (1943)). When an ALJ rejects a claimant's statements about her symptoms, he must "articulate specific reasons" for "discounting [her] testimony"; he may not "'merely ignor[e]' the testimony or rely[] solely on a conflict between the objective medical evidence and the claimant's testimony." *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (quoting *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003)); *see Schomas v. Colvin*, 732 F.3d 702, 709 (7th Cir. 2013) ("If the ALJ disbelieved [plaintiff], he needed to explain that finding in order to build a logical bridge between the evidence and his conclusion."). "Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004); *see Darren M. P. v. Comm'r of Soc. Sec.*, No. 20-CV-534-RJD, 2021 WL 3401243, at *7 (S.D. Ill. Aug. 4, 2021) ("[T]he ALJ 'may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it.'") (quoting *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014)). The ALJ must "explain how [he] reached [his] conclusions" about an applicant's "physical capabilities" by pointing to evidence that "support[s] the propositions for which it is cited." *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) (citing *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005)). "It is not a court's role to displace an ALJ's judgment by making [its] own findings

about the facts, but [a court] cannot uphold an administrative determination that failed to explain the outcome adequately." *Lothridge v. Saul*, 984 F.3d 1227, 1233 (7th Cir. 2021). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Here, plaintiff described her symptoms in some detail at her hearing, explaining that her job duties were reduced and she ultimately lost her job—at a company where she had worked for twenty-nine years—in significant part because of the combined effect of two impairments: (1) she could not type normally due to neuropathy and carpal tunnel syndrome, and (2) the Gabapentin she took to alleviate the "buzzing" nerve pain made her too drowsy to catch mistakes in her typing. Among other issues, she described persistent and progressively more serious pain and discomfort in her hands due to the neuropathy and carpal tunnel syndrome, which caused difficulties extending to activities beyond typing, including by prohibiting her from separating sheets of paper and causing her to drop breakable items. The ALJ concluded generally that plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record" because "the severity of her impairments [was] not evidenced in the record as a whole" and "the record fails to establish her inability to perform all work functions." (AR 67.) He recognized that plaintiff had testified to "sensitivity to cold in her fingers, cramping, and locking of her hands," and some "difficulty performing daily activities." (*Id.*) But at no point did he specifically discuss her testimony about the problems she had had with typing and other tasks due to her hand issues, nor did he address her drowsiness due to the Gabapentin.

Plaintiff provided a plausible account of health problems that had cost her her job, and the ALJ did not address her statements except conclusorily. The ALJ erred by failing to explain how he evaluated plaintiff's testimony about symptoms from her hand issues and the associated use of Gabapentin, although this testimony would seem to have serious consequences for the sedentary employment that was plaintiff's past relevant work. *See Golembiewski*, 322 F.3d at 918 (applicant's "propensity to drop objects because of tingling in his hands" had potential to "reduce[] the number of jobs available" to him). The VE testified that plaintiff could not perform her past relevant work if she could perform only occasional fingering. The ALJ found that plaintiff could perform frequent fingering—but he did not explain how he reached that conclusion, despite plaintiff's testimony that her inability to type had been a key factor in the reduction of her job duties and ultimate loss of her job. *See Herron v. Shalala*, 19 F.3d 329, 333-34 (7th Cir. 1994) (remanding because "the ALJ failed to provide any explanation for the rejection of [the applicant's] subjective complaints of pain in his hands and fingers," although the inability to "work extensively with his hands would have had significant impact on the disability determination").

The only statement in the ALJ's decision that seems to address plaintiff's own statements is the assertion that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." But this is the sort of language that courts recognize as "'meaningless boilerplate.'" *Jacklin D. v. Kijakazi*, No. 19 C 2361, 2022 WL 797049, at *6 (N.D. Ill. Mar. 16, 2022) (quoting *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016)); *see also Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). It explains nothing by itself.

15

There is a subsequent paragraph in which the ALJ cited certain evidence bearing on plaintiff's hand and neuropathy issues, including medical records and medical opinion evidence. This evidence includes the state-agency consultative examination which showed that plaintiff had good grip strength and that she could perform "fine and gross manipulation" with her hands and fingers. Additionally, he cited plaintiff's EMG, which found no evidence of "large fiber neuropathy" and only "mild" neuropathy in her right hand (although it confirmed her carpal tunnel syndrome). But the ALJ did not explicitly connect this paragraph to plaintiff's statements, and even if some such connection were clear, the Court does not see what he might have meant by suggesting that this evidence is inconsistent with plaintiff's testimony. Some of this evidence appears to be consistent with plaintiff's statements about her symptoms; for example, the ALJ himself recognized that plaintiff had carpal tunnel syndrome in both hands. Other evidence in this vein may not have conclusively confirmed or substantiated plaintiff's statements about the intensity or limiting effects of her own symptoms—but even if so, the absence of medical evidence to "substantiate" an applicant's statements is not a proper basis to reject or disregard them. 20 C.F.R. § 404.1529(c)(2); SSR 16-3p, 2016 WL 1119029, at *5. Testimony of subjective symptoms cannot be "disregarded simply because it is not supported by objective medical evidence." *Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016); *Pierce v. Colvin*, 739 F.3d 1046, 1050-51 (7th Cir. 2014); *Wafa O. v. Kijakazi*, No. 19 C 3455, 2022 WL 103692, at *8 (N.D. Ill. Jan. 11, 2022) (citing *Lambert v. Berryhill*, 896 F.3d 768, 777 (7th Cir. 2018)).

Further, the fact that certain medical evidence did not confirm the intensity and persistence of plaintiff's symptoms did not make that evidence inconsistent with plaintiff's statements about her symptoms. Courts have recognized that an ALJ may err by mistaking the absence of

16

confirmation of a symptom during a brief examination for inconsistency with other evidence of the symptom. *See Gerstner v. Berryhill*, 879 F.3d 257, 264 (7th Cir. 2018) ("The ALJ said that [the applicant's] pain complaints were inconsistent with her abilities [as measured in exams]. But these findings are consistent with Gerstner's pain complaints. She never testified that . . . her condition totally impaired the abilities tested in these exams."); *Lambert*, 896 F.3d at 777; *Cullinan v. Berryhill*, 878 F.3d 598, 605 (7th Cir. 2017); *see also Pierce*, 739 F.3d at 1050 (remanding in part because ALJ had "misunderstood the import" of certain evidence in rejecting the applicant's statements, which were "not so contradicted by medical evidence as to be incredible"); *Miranda J-T. v. Comm'r of Soc. Sec.*, No. 19-CV-076-DGW, 2019 WL 3767031, at *6 (S.D. Ill. Aug. 9, 2019) ("None of the findings [the ALJ] highlighted contradict plaintiff's allegations. . . . The ALJ fails to build the requisite logical bridge between the evidence and his conclusion where he relies on evidence which 'does not support the proposition for which it is cited.'") (quoting *Scott*, 647 F.3d at 740). Plaintiff did not testify that she suffered from paralysis or a complete lack of nerve function that "totally impaired the abilities tested" by her examining and treating providers; rather, she testified that her pain, carpal tunnel syndrome and neuropathy, as well as the drowsiness from her medication for her neuropathy, made it difficult for her to type and compromised her ability to attend to her work. *See Gerstner*, 879 F.3d at 264; *see also Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) ("The [ALJ] expressed doubt about [the applicant's] credibility on the further ground of her 'activities of daily living,' notably that she can walk up to one block, . . . bathe and dress normally, . . . [etc.] But she had never testified that she was immobilized.").

The Court cannot tell from the ALJ's decision how he evaluated plaintiff's testimony on these points, which he did not discuss, although it was not (as he seemed to imply) contradicted

by the medical evidence. The ALJ mentioned that the medical evidence in the record showed "conservative treatment" (AR 69), but he did not mention what more aggressive treatment he would have expected to see.[4] To the extent there was other evidence that the ALJ interpreted to show that plaintiff's impairments were less serious than her complaints suggested, he needed to "articulate specific reasons" why. *Schmidt*, 395 F.3d at 746; *see Steele*, 290 F.3d at 941; SSR 16-3p, 2016 WL 1119029, at *9; *see also Kevin B. v. Saul*, No. 19 C 1655, 2020 WL 2468131, at *12 (N.D. Ill. May 13, 2020). It was not enough to state conclusorily that plaintiff's statements were "not[] supported or consistent." SSR 16-3p, 2016 WL 1119029, at *9.

This Court must "uphold an ALJ's decision if it is supported by substantial evidence, but that standard is not satisfied unless the ALJ has adequately supported his conclusions." *Meuser v. Colvin*, 838 F.3d 905, 910 (7th Cir. 2016). Because the ALJ's explanation of his decision was inadequate, the Court must remand for further consideration of plaintiff's complaints, particularly those about her problems with her hands and the issues stemming therefrom. The Court hastens to add that it does not rule that the ALJ's conclusion was wrong, to the extent he concluded that plaintiff could perform her past relevant work, despite her testimony to the contrary. It merely remands for further consideration and explanation of how the ALJ evaluated plaintiff's subjective statements about her symptoms.

---

[4] Additionally, it may have been unfair to hold any "conservative" treatment against plaintiff, to the extent it was "conservative" to forego surgery, when evidence showed that plaintiff declined surgery because she felt she could not afford it. (AR 381.) While the ALJ was not precluded from drawing inferences based on conservative treatment, he needed to "explor[e] why the treatment history was thin," bearing in mind plaintiff's lack of resources. *See Pierce*, 739 F.3d at 1050.

III.   **Dr. Babbo's Opinions**

Plaintiff argues that the ALJ improperly evaluated the medical opinions of her treating physician, Dr. Babbo. Under the regulation applicable to claims—such as plaintiff's—filed after March 27, 2017, an ALJ must consider a number of enumerated factors to determine how "'persuasive'" a medical opinion is. *Kelly v. Kijakazi*, No. 3:21CV176, 2022 WL 633313, at *3 (N.D. Ind. Mar. 4, 2022) (quoting 20 C.F.R. § 404.1520c(c)). The factors the ALJ should consider include (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, such as the source's familiarity with the other evidence relevant to a claim or the source's understanding of SSA policies and requirements. 20 C.F.R. § 404.1520c(c). An ALJ's duty is to "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." 20 C.F.R. §§ 404.1520c(a) and (b)(1). Supportability and consistency are the two "most important factors," so, in discharging his duty to "articulate . . . how persuasive" a medical opinion is, the ALJ must "explain how [he or she] considered" those factors, in particular. 20 C.F.R. §§ 404.1520c(b)(2). The SSA does not "defer or give any specific evidentiary weight . . . to any medical opinion(s)," including those from treating physicians. 20 C.F.R. § 404.1520c.[5]

_____

[5] Previously, when a DIB applicant offered a treating physician's medical opinion in support of her application, the SSA was required to give "controlling weight" to the opinion, as long as it was well-supported and consistent with other substantial evidence. *See* 20 C.F.R. § 404.1527. But that regulation has been superseded by 20 C.F.R. § 404.1520c, so the SSA no longer concerns itself with where an opinion fits in a "perceived hierarchy of medical sources" or how much "weight" to assign it. *See Kelly*, 2022 WL 633313, at *3.

The ALJ concluded that Dr. Babbo's opinions were not entirely consistent with or supported by the objective evidence. Regarding Dr. Babbo's 2018 opinion, the ALJ wrote that it was "not wholly consistent with or supported by the objective medical evidence" because "the record fails to support the stand and walk limitations to less than two hours when the claimant utilizes a cane." (AR 69.) Regarding the 2019 opinion, he wrote that it was "not fully consistent with the objective medical evidence and . . . completely inconsistent with the benign results of his examination on the same date that he rendered his opinion." (*Id.*) Plaintiff argues that, in fact, there is a "wealth" of evidence consistent with Dr. Babbo's opinions. (Pl.'s Br. at 4, ECF No. 17.) The Court tends to agree, and to the extent that the ALJ did not adequately discuss this "wealth" of consistent evidence, the Court cannot follow his application of the supportability and consistency factors to Dr. Babbo's opinions. Again, as with plaintiff's subjective complaints, the ALJ seemed to demand confirmation of Dr. Babbo's opinions rather than look for consistency, and to the extent that he had other reasons for finding Dr. Babbo's opinions no more than "somewhat persuasive" as to the extent of the limiting effects of plaintiff's impairments, he did not adequately explain them.

The most glaring issue is that the ALJ provided no reason at all for rejecting the limitations on plaintiff's fingering that Dr. Babbo had identified. In the 2018 opinion, Dr. Babbo wrote that plaintiff's carpal tunnel syndrome was so severe as to prevent her from using a "computer/keyboard." (AR 477.) Similarly, in the 2019 opinion, he wrote that she could only use her hands for "grasping, turning, [and] twisting objects" for about 10% of the workday, and she could only use her fingers for "fine manipulations" for 5% of the workday. These limitations are at least facially consistent with plaintiff's testimony and with medical evidence such as her EMG

20

and other imaging. (*See, e.g.*, AR 500, 584-86.) Again, the Court is unable to determine what the ALJ meant, to the extent that he expressed a conclusion that the evidence was inconsistent with these limitations.

To the extent the ALJ's conclusion is based on his interpretation of medical evidence such as the EMG, the ALJ was not permitted to substitute his own lay interpretation of medical evidence for Dr. Babbo's expert interpretation. *Kaminski v. Berryhill*, 894 F.3d 870, 875 (7th Cir. 2018) ("'ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves.'") (quoting *Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014)); *Deborah M. v. Saul*, 994 F.3d 785, 790 (7th Cir. 2021) ("[A]n ALJ 'must not succumb to the temptation to play doctor.'") (quoting *Rohan v. Chater*, 98 F.3d 955, 970 (7th Cir. 1996)); *see Rohan*, 98 F.3d at 971 (explaining that an ALJ may not "substitut[e] his own judgment for that of the medical witnesses"). The Court cannot tell whether the ALJ rejected Dr. Babbo's opinion as to intensity, persistence, and limiting effects based on his own improper reinterpretation of medical evidence such as the EMG, which would be improper. *See Kaminski*, 894 F.3d at 875 ("The judge also erred when he relied on his own interpretation of Kaminski's MRI instead of Dr. Cristea's."). He may have done so, as he did not precisely "connect the evidence to the conclusion" in that regard. *See Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012).

The only specific explanation the ALJ offered for finding that the 2018 opinion was "not wholly consistent with or supported by the objective medical evidence" was that "the record fails to support the stand and walk limitations to less than two hours when the claimant utilizes a cane." (AR 69.) Not only does this leave out the hand issues altogether, but also it fails to address the evidence that tended to support the "stand and walk limitations" or explain why the ALJ judged it

to be insufficient to support Dr. Babbo's conclusion. There was copious evidence showing that plaintiff had back and knee problems that limited her strength and mobility (*see, e.g.*, AR 270, 281, 333, 381, 397, 435, 437, 471, 909-11), and the ALJ should have addressed it and explained why Dr. Babbo's opinion was unpersuasive, this evidence notwithstanding. *Evonne R. v. Kijakazi*, No. 20 CV 7652, 2022 WL 874650, at *5 (N.D. Ill. Mar. 24, 2022) ("A conclusion that a medical opinion [is] inconsistent with the record is not enough—the ALJ must adequately explain the basis for that conclusion.") In an earlier portion of the decision, the ALJ summarized medical evidence of plaintiff's musculoskeletal impairments, and the Court gathers that this evidence shows that plaintiff could get around a bit with the use of a cane; but the ALJ never explained how he concluded that the fact that plaintiff had some mobility with the assistance of a cane meant that she was capable of more than two hours of standing and walking in in a typical workday. *See Keller v. Comm'r of Soc. Sec.*, No. 1:20-CV-465 JD, 2022 WL 1553426, at *6 (N.D. Ind. May 16, 2022) ("The ALJ repeatedly cites normal right knee imaging as supporting her RFC, but it's unclear to the Court how the ALJ jumps from normal right knee imaging to the myriad of findings contained in her RFC, such as her ability to frequently crouch or lift a specific weight."). The ALJ should have explained how he jumped from the medical evidence to specific limitations, such as the ability to walk or stand for a specific time frame. *See id.*

As for Dr. Babbo's 2019 medical opinion, the only explanation the ALJ provided other than that it was "not fully consistent with the objective medical evidence" was that it was "completely inconsistent with the benign results of [Dr. Babbo's] examination on the same date that he rendered his opinion" and "[s]pecifically, there is no evidence to substantiate the constant elevation of the legs while seated." (AR 69.) Again, the Court cannot follow the ALJ's reasoning.

22

The Court has reviewed the medical record of the examination Dr. Babbo performed on the same date as the 2019 opinion, and it cannot identify the inconsistency that the ALJ found, which he does not explain. Indeed, the ALJ's explanation is puzzling because the record specifically mentions the opinion: in the section titled "Impression and Plan," Dr. Babbo noted, "Gait disturbance: See form filled out today." (AR 611.) Surely the "form" mentioned here is the "Peripheral Neuropathy Residual Functional Capacity Questionnaire" form, which documents the very medical opinion in question and describes serious issues with plaintiff's hands and feet based on her earlier EMG (which is explicitly cited) and Dr. Babbo's examination, as well as other issues. (*See* AR 587-89.) The Court fails to see how the results of the examination can be inconsistent with the medical opinion if the record of the examination expressly incorporates the opinion into it.

As for the purported lack of evidence supporting the elevation of plaintiff's legs, the Court does not see why the ALJ's disagreement with this isolated detail undermines the persuasiveness of the opinion as a whole. That detail seems irrelevant to the issues on which the ALJ's decision turned—the ALJ recognized that plaintiff was limited to sedentary employment, and this portion of the form questionnaire explicitly assumes sedentary employment (AR 588), and the Court fails to see why having to elevate one's legs while seated should interfere with sedentary employment. But even putting the limited relevance of the issue aside, the Court fails to see what basis the ALJ had for determining that there was no support for it. Again, there was copious evidence of plaintiff's back, knee, and foot issues, and it was for a doctor to judge what measures were appropriate to mitigate them. The ALJ may have "played doctor" by presuming to reject Dr.

23

Babbo's judgment in this regard.[6] *See Deborah M.*, 994 F.3d at 790; *Rohan*, 98 F.3d at 970. Regardless, a fuller explanation of the ALJ's reasoning is necessary. *Evonne R.*, 2022 WL 874650, at *5 ("[T]he ALJ [erred because he] never mentioned [a medical] opinion that plaintiff could bilaterally reach, handle, or finger for only 10 percent of the workday[, which] finding conflicted with the ALJ's RFC determination that plaintiff could do all these things 'frequently'—up to two thirds of the day.")

For these reasons, the Court agrees with plaintiff that the ALJ erred in evaluating Dr. Babbo's opinions by failing to articulate his reasons for finding them to be of limited persuasiveness.

## IV.    RFC Assessment

Plaintiff argues that the ALJ erred in making his RFC assessment by failing to adequately account for the drowsiness caused by the Gabapentin and for plaintiff's obesity, which may complicate and exacerbate other health problems.

It is no doubt already clear from the above discussion that the Court tends to agree with plaintiff that the ALJ's consideration of plaintiff's drowsiness was inadequate. The ALJ barely addressed this issue, although plaintiff identified it as a critical factor in her inability to perform at work, and Dr. Babbo identified plaintiff's drowsiness as an issue that would "have implications for working." (AR 588.) This issue will require a fresh look on remand. As for plaintiff's obesity, the Court need not address the issue at this time. The Court is already remanding for reevaluation

---

[6] Notably, if the problem was that the ALJ could not discern what the basis for Dr. Babbo's opinion was, he could have elected, at his discretion, to recontact Dr. Babbo to clarify. *See* 20 C.F.R. § 404.1520b(b)(2)(i); *see also Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007); *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *6 (N.D. Ill. Jul. 20, 2022).

of plaintiff's subjective symptoms and Dr. Babbo's opinion, and the reevaluation may alter the ALJ's view of the RFC assessment and the relative weight of the evidence that it was based on. The ALJ will have the opportunity to take a fresh look at plaintiff's obesity and give it due consideration alongside all the other evidence in reassessing plaintiff's RFC and how it compared with the demands of plaintiff's past relevant work.

### Conclusion

For the reasons set forth above, the Court denies defendant's motion for summary judgment [23], reverses the Social Security Administration's decision, and remands this case to the Social Security Administration for further proceedings consistent with this Memorandum Opinion and Order.  This case is terminated.

**SO ORDERED.**                                          **ENTERED:   August 29, 2022**

_____
**HON.  JORGE L. ALONSO**
**United States District Judge**